*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-FS-376

IN RE PETITION OF A.T.J. AND L.D.J.,

L.M.J., APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(ADA-86-13)

(Hon. Sean C. Staples, Trial Judge)
(Hon. Heidi M. Pasichow, Reviewing Judge)

(Argued September 20, 2017           Decided March 18, 2021)

*Leslie J. Susskind* for appellant L.M.J., father of K.J.

*Pamela Soncini*, Section Chief, Family Services Division, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General at the time the brief was filed, and *Loren L. AliKhan*, Deputy Solicitor General at the time the brief was filed, were on the brief, for appellee the District of Columbia.

*Stephen L. Watsky* for appellees A.T.J. and L.D.J.

*Joseph W. Jose*, guardian ad litem, filed a statement in lieu of brief for K.J. supporting the brief of appellees A.T.J. and L.D.J.

Before BECKWITH, *Associate Judge*, and STEADMAN and FISHER,* *Senior Judges*.

Opinion for the court by *Senior Judge* FISHER.

Dissenting opinion by *Associate Judge* BECKWITH at page 23.

FISHER, *Senior Judge*:  The principal issue in this contested adoption case is whether the natural father, who has never met his daughter and does not seek custody of her, is entitled to the benefit of the presumption in favor of a natural parent.  We hold that he is not.

## I.  Background

K.J. was born on December 14, 2006.  Appellant L.M.J. is her biological father and C.J. is her biological mother.  C.J. cared for K.J. by herself until 2009.  Because C.J. received "little to no family support and had both suicidal and homicidal thoughts," she voluntarily placed K.J. and her younger half-brother in foster care in October 2009.  L.M.J. learned of K.J.'s existence sometime between 2010 and 2011 but has never met K.J. or played a role in her life.

---

* Judge Fisher was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on August 23, 2020.

Mr. and Mrs. J., the appellees, first met K.J. in 2009 when they began providing daycare services for her. In order to give K.J. and her brother a home, the J.s became licensed foster parents. K.J. began living with the J.s on January 12, 2013, and they petitioned to adopt her on April 17, 2013. C.J. and L.M.J. did not consent to the adoption and on October 1, 2014, Magistrate Judge Sean Staples began a multi-day trial on the J.s' adoption petition.

Magistrate Judge Staples heard testimony from the J.s, C.J., and K.J.'s social workers and therapists. Although present for much of the hearing and represented by counsel throughout, L.M.J., the biological father, did not testify or call any witnesses. L.M.J. did not seek custody of K.J. but instead "oppose[d] the adoption because it may jeopardize his ability to form a relationship with K.J."

C.J. testified that L.M.J. was not made aware of the possibility of paternity until sometime in 2010 or 2011 when she met L.M.J. "by chance in the community and told him he was K.J.'s father." Prior to this chance encounter, C.J. made alternate assertions about paternity when, on October 15, 2009, during neglect proceedings, she filed an affidavit ("Biological Mother's Affidavit Concerning Paternity") naming another man ("A.P.") as K.J.'s father. However, a court ordered DNA test, administered on July 2, 2013, revealed that A.P. was not K.J.'s

biological father.  C.J. then filed a new "Biological Mother's Affidavit Concerning Paternity" on July 26, 2013—in the same neglect proceedings—naming L.M.J. as K.J.'s father.  L.M.J.'s paternity was confirmed by a DNA test administered on July 15, 2014.

In the years between his chance meeting with C.J. and his eventual DNA test, L.M.J. did not make any effort to contact K.J.  During the 2010 or 2011 encounter, C.J. had given L.M.J. a picture of K.J. which he kept and eventually showed to Rochelle White, K.J.'s social worker, in 2014.  In late July or early August of 2014—about three years after being told he was K.J.'s father but shortly after the paternity test—L.M.J. called the foster care agency and asked to visit K.J. However, K.J. did not want to meet L.M.J. and her therapist recommended that L.M.J. write her letters in an attempt to build a relationship.   During trial L.M.J.'s lawyer claimed that L.M.J. "attempted to contact the agency over the years to get information about K.J.," but presented no evidence regarding the timing or nature of those contacts.  L.M.J. had admitted to K.J.'s social worker "that he was incarcerated two separate times for at least two years between the period of time he was told that K.J. was his daughter and 2014."

Testimony from the J.s and Dr. Giselle Aguilar Hass, a licensed psychologist, established that K.J. was "fully integrated" into the petitioners' home. K.J. viewed the J.s as her parents and the J.s' biological children as her brothers. The J.s were "steadfast advocates for [K.J.'s] care and well-being" and worked with her "medical and mental health providers to provide consistent and appropriate services" for her special needs. Magistrate Judge Staples also "credit[ed] Dr. Hass' opinion that K.J. . . . and Mr. and Mrs. J. all love each other very much and that removal of [K.J.] from their care would have a significant negative emotional impact on [her]." At the time of trial, K.J. still did not wish to visit her biological father, L.M.J. The trial court admitted testimony from Lisa Larabee, K.J.'s therapist, in which she stated that K.J. told her multiple times that she wished to be adopted by the J.s. K.J.'s guardian ad litem "also filed his support of the proposed adoption."

On February 26, 2015, Magistrate Judge Staples issued a written Order that waived consent to the adoption because there was clear and convincing evidence that L.M.J. and C.J. were withholding their consent contrary to K.J.'s best interest. *See* D.C. Code § 16-304(e) (2012 Repl.). In his Findings of Fact and Conclusions of Law, Judge Staples weighed the factors listed in D.C. Code § 16-2353(b)(1-4) (2012 Repl.), which provide grounds for determining whether it is in the child's

best interest to terminate the parent-child relationship. However, he made no express finding that L.M.J. and C.J. were unfit parents. A final decree of adoption was issued on November 17, 2015.

L.M.J. and C.J. both filed motions for review of the magistrate judge's order. L.M.J. argued that his fundamental rights as a parent were violated when the magistrate judge waived his consent to the adoption. He claimed he had "grasped his opportunity interests" and was "therefore entitled to a legal presumption in favor of maintaining his parental relationship with K.J."

Associate Judge Heidi M. Pasichow concluded on review that the magistrate judge did not violate L.M.J.'s constitutionally protected parental rights by waiving his consent to the adoption. She observed that "the record . . . demonstrate[d] that [L.M.J.] desire[d] to form a relationship with K.J., but that he [did] not wish to carry the responsibilities that adhere in being K.J.'s parent." Although "the termination of [L.M.J's] parental rights [was] a drastic remedy, the 'wait and see' alternative—indefinitely deferring adoption of K.J. while she cycles through the foster care system—[was] not a viable one as it is contrary to the child's best interests." After acknowledging the preference in adoption proceedings for a fit unwed father who has grasped his opportunity interest, Judge Pasichow determined

that L.M.J.'s parental rights could still be terminated if there was clear and convincing evidence that the proposed adoption was in K.J.'s best interest.[1]  On December 20, 2016, she issued an Order affirming the decision of the magistrate judge.  L.M.J. now appeals.  The biological mother, C.J., did not file an appeal.

## II.  Standard of Review

"We review a trial court's determination in a proceeding to terminate parental rights (TPR) and waive a natural parent's consent to adoption for abuse of discretion."  *In re S.L.G.*, 110 A.3d 1275, 1284 (D.C. 2015).  "[O]ur task is to ensure that the trial court has exercised its discretion within the range of permissible alternatives, based on all relevant factors and no improper factor."  *Id.* (internal quotation marks and citation omitted).  Moreover, the trial court's decision must be "supported by substantial reasoning drawn from a firm factual foundation in the record."  *In re J.C.F.*, 73 A.3d 1007, 1012 (D.C. 2013) (quoting

---

[1]  Judge Pasichow quoted from *In re Baby Boy C*, 630 A.2d 670, 682 (D.C. 1993) (Although the District of Columbia's adoption statute incorporates "a preference for a fit unwed father who has grasped his constitutionally protected opportunity interest . . . [t]his preference may be overridden if it is shown by clear and convincing evidence that the proposed adoption is in the best interests of the child . . . for that interest is the paramount consideration.") (alterations and omissions in original).

*In re C.L.O.*, 41 A.3d 502, 510 (D.C. 2012)). We treat "the magistrate judge's factual findings as the findings of the trial judge and review for abuse of discretion or a clear lack of evidentiary support. As to alleged errors of law, however, we review the record *de novo*, without deference to the judges below." *In re C.L.O.*, 41 A.3d at 510 (internal quotation marks and citation omitted).

### III. The Presumption in Favor of a Natural Parent

In contested adoption cases where a parent seeks custody, we recognize a presumption that a child's best interest is served by placing her with her natural parent, provided the parent is not proven unfit. *In re S.L.G.*, 110 A.3d 1275, 1285 (D.C. 2015). "This presumption in favor of the natural parent is a strong one that reflects and reinforces the fundamental and constitutionally protected liberty interest that natural parents have in the care, custody, and management of their children." *Id.* at 1286 (citing *Troxel v. Granville*, 530 U.S. 57, 65-66, 68-69 (2000)).

Appellant primarily complains that the trial court did not properly apply this presumption — that it terminated his parental rights without first making a finding

of unfitness.[2] To support his argument that the trial court skipped a crucial step, appellant cites our decision in *In re Ta.L.*, 149 A.3d 1060, 1081 (D.C. 2016) (en banc), where we stated "that the presumption in favor of a fit parent's right to raise his or her children must be rebutted by a finding of parental unfitness before the trial court can make the ultimate determination to terminate a biological parent's rights to raise his or her children." As we will demonstrate, however, this general requirement does not mean that every natural parent automatically qualifies for the presumption (sometimes called a preference).

The "mere existence of a biological link," *Lehr v. Robertson*, 463 U.S. 248, 261 (1983), does not entitle a parent to the presumption. Instead, such a link presents an opportunity which the parent must grasp. *Id.* at 261-62; *Appeal of*

---

[2] Two important decisions of this court stressing the importance of explicit or implicit findings of unfitness were issued after the magistrate judge's findings of fact and conclusions of law were filed. *See In re S.L.G.*, 110 A.3d 1275 (D.C. 2015) (decided March 5, 2015); *In re Ta.L.*, 149 A.3d 1060 (D.C. 2016) (en banc) (decided December 8, 2016).

*H.R.*, 581 A.2d 1141, 1160 (D.C. 1990).[3]   After focusing more closely on the nature of the presumption, we hold that appellant should not benefit from it for two separate reasons:   he does not seek "an actual relationship of parental responsibility," *Lehr*, 463 U.S. at 260, and he failed to grasp his opportunity to be a father.

## A.  Appellant Does Not Benefit From the Parental Presumption Because He Does Not Seek To Assume the Responsibilities of a Parent.

Undergirding this preference is the recognition that a biological parent has the "right to *raise*" or "*parent* his or her child." *In re Ta.L.*, 149 A.3d at 1081 (emphasis added) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)).  Thus, we consistently characterize the preference as a "presumptive right to *custody*" or a "*custodial* preference," indicating that a parent must seek actual or legal custody of

---

[3]  In *Lehr*, 463 U.S. at 262, the Supreme Court distinguished between the rights of a parent with a mere biological connection to the child and those of a parent linked to the child by both biology and action: The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring.  If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development.  If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie.

his child in order to benefit from it. *See, e.g.*, *Appeal of H.R.*, 581 A.2d at 1173 (Ferren, J., concurring) ("[A]n unwed, noncustodial father who has not lost his opportunity interest has maintained a sufficient connection with his child to receive the custodial preference—the presumptive right to custody . . . ."); *In re S.M.*, 985 A.2d 413, 417 (D.C. 2009) (describing this preference as "a custodial preference for a fit parent"). In other words, "the rights of the parents are a counterpart of the responsibilities they have assumed." *Lehr*, 463 U.S. at 257.

The Supreme Court vividly illustrated this principle in *Quilloin v. Walcott*, 434 U.S. 246 (1978), where the natural father argued that "he was entitled as a matter of due process and equal protection to an absolute veto over adoption of his child [by the husband of the child's mother], absent a finding of his unfitness as a parent." *Id*. at 253. Unlike appellant, Mr. Quilloin was not a stranger to his child; he had provided some financial support and had visited him on many occasions. *Id*. at 251. He "attempted to block the adoption and to secure visitation rights, but he did not seek custody or object to the child's continuing to live with appellees." *Id*. at 247.

The Court recognized that "the relationship between parent and child is constitutionally protected" and "[i]t is cardinal . . . that the custody, care and

nurture of the child reside *first* in the parents . . . ." *Id*. at 255 (emphasis added). However, this was "not a case in which the unwed father at any time had, or sought, actual or legal custody of his child" and the result of adoption by the child's stepfather would "give full recognition to a family unit already in existence . . . . " *Id.* at 255. The Court held that the natural father's constitutional rights were not violated by granting the adoption over his objection, based on a "best interests of the child" standard, without first finding him unfit. *Id*. at 254-56.

Similar to the natural father in *Quilloin*, "[appellant] has not asked for K.J. to be placed in his care and instead opposes the adoption because it may jeopardize his ability to form a relationship with K.J." But *Quilloin* teaches that this is not enough. To successfully oppose an adoption petition, a biological parent must do more than express a desire "to form a relationship" with his offspring; he must seek to shoulder "significant responsibility with respect to the daily supervision, education, protection, or care of the child." *Id*. at 256. We agree with our dissenting colleague that cohabitation is not the only way to participate in raising or parenting a child, *post* at 34 n.14, but appellant has not even presented a plan for accepting "some measure of responsibility for the child's future." *Lehr*, 463 U.S.

at 262.[4]  For this reason alone, he is not entitled to the presumption in favor of a fit natural parent. Thus, there was no "need for a threshold determination," *In re S.L.G.*, 110 A.3d at 1288, that the parental presumption had been rebutted.

### B.  Appellant Does Not Benefit from the Presumption Because He Did Not Grasp His Opportunity Interest.

The trial court "will invoke the presumption or preference in favor of a fit, unwed, noncustodial father *only* when the court finds that he timely grasped his constitutional 'liberty' interest—now commonly called his 'opportunity interest'—protected by due process."  *In re C.L.O.*, 41 A.3d at 511 (emphasis added; footnotes omitted); *see also In re S.M.*, 985 A.2d at 417 n.7 ("[N]oncustodial fathers are entitled to the presumption in favor of a fit parent only after they have 'grasped' their 'opportunity interest' . . . .") (citation omitted).

A biological father who does not grasp this opportunity does not benefit from the parental presumption and therefore is not entitled to the finding of unfitness required to rebut it.  *See In re S.G.*, 581 A.2d 771, 787-88 (D.C. 1990)

---

[4]  Although appellant "asked that his grandmother and aunt, who live together, be considered as a placement option for K.J.," "the grandmother stated she did not want to be considered as a placement" and appellant offered no alternatives.

(Rogers, C.J., concurring) ("[W]hat might have presented a problem had the natural father grasped his opportunity interest, namely, that the judge never made any findings regarding the father's fitness . . . , is not present here."). Although neither the magistrate judge nor the associate judge expressly decided whether appellant had grasped his opportunity interest, a remand is not required. "[B]ecause the question of whether [appellant] grasped his opportunity interest is a question of ultimate fact, meaning a question of law, we are empowered to answer that question by marshaling subsidiary facts found by the magistrate judge (to which we defer in the absence of clear error)." *In re C.L.O.,* 41 A.3d at 519 (Ferren, J., concurring). Based on our case law and the facts found by the magistrate judge, we conclude as a matter of law that appellant did not grasp his opportunity interest.

Appellant argues to the contrary—that he "did all he could reasonably be expected to do in order to grasp his opportunity interest." For example, appellant claims, without offering any proof (recall that appellant did not testify), that after first being told that he was K.J.'s father (sometime in 2010 or 2011), he attempted to contact the agency to get information about her. Appellant also argues that, once a paternity test confirmed that he was K.J.'s father (in 2014), he "did all he could do under the circumstances" to assert his parental rights and meet K.J. He

met with K.J.'s social worker, Rochelle White, and requested visits with his daughter. After visitation was denied because K.J. did not want to meet him, appellant wrote letters to K.J., hoping to develop a relationship with her.

Our cases demand much more. "[A] natural father who fails *promptly* to assert his opportunity interest in developing a relationship with his child may forever lose that interest." *Appeal of H.R.*, 581 A.2d at 1161 (Ferren, J., concurring) (discussing *Lehr*, 463 U.S. at 261-63 (emphasis added)).

Previous statements by this court indicate that a father's opportunity to grasp his interest could start as soon as "he learn[s] of the pregnancy and birth." *In re C.L.O.*, 41 A.3d at 522 & n.17 (Ferren, J., concurring) (stating father should have asserted his custodial rights "as soon as he learn[ed] of the pregnancy and birth" and knew it "might have been a possibility" the child was his). However, the record does not establish that appellant knew about C.J.'s pregnancy, and C.J. testified that she lost contact with him during the first few years of K.J.'s life. On this record we therefore do not fault appellant for failing to act as soon as K.J. was born.

Nevertheless, in 2010 or 2011 C.J. met appellant "by chance in the community and told him he was K.J.'s father." During this meeting she gave appellant a picture of K.J. which he kept. Despite learning that he had a daughter, the trial court found, appellant "did not ask [C.J.] to meet or otherwise contact K.J." Appellant also received notice of the pending adoption proceeding, which named him as K.J.'s father, on September 5, 2013. However, it was not until July 2014, after he received the results of the paternity test, that appellant first reached out to the agency and asked for information about K.J. His counsel claims that appellant called the agency multiple times between 2011 and 2014, but appellant presented no evidence of these contacts. Although appellant expressed a desire to form a relationship with K.J. after the paternity test, this three-year gap indicates that appellant did not promptly assert his opportunity interest.[5]

Even if appellant reached out to the agency earlier than 2014, and even if his delay could be excused because of the initial uncertainty about the identity of K.J.'s father, we still conclude that appellant has not "done all that he could reasonably have been expected to do under the circumstances to pursue [his

[5] In her opening statement during trial, appellant's counsel indicated that appellant's "visitation was limited by the fact that he was not biologically determined to be K.J.'s father." However, the trial court determined "there was no evidence presented at trial of such a limitation."

opportunity] interest." *Appeal of H.R.*, 581 A.2d at 1162-63; *see also In re J.F.*, 615 A.2d 594, 597 (D.C. 1992) (natural father grasped his opportunity interest because he "provided a home for [his son] . . . during the first part of his life" and "continued to provide financial support" even after mother left and took the child from father's home); *In re M.N.M.*, 605 A.2d 921, 926-27 (D.C. 1992) (where unwed teenage mother took newborn child to the District of Columbia, placed her for adoption, and would not reveal child's location, father timely "asserted his paternity and the right to assume the obligations of fathering" his child by "pursu[ing] the only means available to him to learn the child's whereabouts and prevent an adoption—filing [a paternity and custody] suit" in St. Louis one week after the child's birth). *Compare In re W.D.*, 988 A.2d 456, 459-62, 465 (D.C. 2010) (holding that mother did not grasp her opportunity interest because she was not a "consistent [] presence in [her daughter's] life," did not "assist with . . . [her daughter's] care," and did not appear at the adoption hearing), *with In re A.C.*, 597 A.2d 920, 927 (D.C. 1991) (although the natural father had met the child and appeared at multiple hearings, he had failed to grasp his opportunity interest because he "never seized the full panoply of interactions, characteristics and attendant responsibilities which define the parent and child relationship") (internal quotation marks omitted).

The trial court found that appellant "has not played any role in [K.J.'s] life." It also noted that appellant did "not want to care for K.J. at this time" and "argues that the adoption should not be granted because it may jeopardize his ability to form a relationship with [her]." No evidence showed that appellant had physically, emotionally, or financially cared for K.J. in any way. Indeed, at the time of the adoption trial, appellant had never even met eight-year-old K.J. and was "in the process of writing letters to introduce himself to her."

While the Supreme Court has established that a court may not terminate the rights of a biological father contesting an adoption without first giving him an opportunity to be heard, *Stanley v. Illinois*, 405 U.S. 645, 655 (1972), in this case, appellant has no grounds on which to complain that he suffered a due process violation. He was given notice of the trial, and attended most of it, and the court appointed counsel to represent him. Nevertheless, appellant did not testify, present witnesses, or express any desire, much less a plan, to assume his responsibilities as a parent.

It is this latter failure that conclusively shows appellant's failure to grasp his opportunity interest. We agree with appellees: "If there was ever a time to assert your interests, the adoption trial was it, but L.M.J. failed to do so." To be sure,

appellant's counsel forcefully argued that he "wants the adoption to be denied so that . . . he could work on developing a relationship with his child." But opposing adoption (and the consequent termination of parental rights) is not the same thing as grasping the opportunity to be a parent to your child. And counsel candidly acknowledged "we don't know where it will go[.]" *See In re J.L.*, 884 A.2d 1072, 1078 (D.C. 2005) ("wait and see" approach strongly disfavored by public policy and federal legislation).

Nor is it enough that appellant may have "had a genuine interest" in getting to know his daughter. *Post* at 36. Based on the facts found by the magistrate judge and the cases discussed above, we conclude as a matter of law that appellant failed to grasp his opportunity interest.[6] For this reason as well, he was not entitled to the

---

[6] In *In re D.S.*, 88 A.3d 678, 692 (D.C. 2014), we remanded because neither the magistrate judge nor the associate judge had fully considered the parental presumption when deciding to commit the children to the care of the Child and Family Services Agency. *Id.* at 697. Furthermore, the record, "with its many unanswered questions and yet-to-be-investigated facts, d[id] not demonstrate that the court could have readily made . . . findings" that the natural father had failed to grasp his opportunity interest or that he was an unfit parent. The record indicated instead that the "father had been involved in the children's lives, that the children spent weekends with him, that they viewed themselves as having two homes," and that the father "repeatedly requested immediate release of [the] children into his custody." *Id.* at 682, 692. In contrast to appellant's case, the record in *In re D.S.* demonstrated that the natural father had played a significant role in the children's lives and clearly desired to take custody of them.

parental presumption or to the finding of unfitness ordinarily required to rebut it.[7]

### IV.  Adoption Was in K.J.'s Best Interest.

Finally, appellant argues that, regardless of whether he was entitled to the presumption in favor of a fit parent, the trial court still lacked "a sufficient basis on which to base the waiver of [his] consent" and abused its discretion by granting the J.s' petition to adopt.  We disagree.  Although appellant had nothing more than an inchoate relationship with K.J., he received notice, a hearing, representation by counsel, and the full benefit of our statutes governing adoption and the termination of parental rights.

A petition for adoption generally cannot be granted without the agreement of both parents, but consent may be waived if a parent withholds it contrary to the best interest of the child.  D.C. Code § 16-304(e).  "Because granting an adoption without the natural parent's consent necessarily terminates the parent's rights," the

---

[7] "Broadly speaking, . . . fitness refers to the parent's intention and ability over time to provide for a child's wellbeing and meet the child's needs.  The question of fitness turns, in other words, on 'whether the parent is, or within a reasonable time will be, able to care for the child in a way that does not endanger the child's welfare.'"  *In re S.L.G.*, 110 A.3d at 1286-87 (quoting *In re Rashawn H.*, 937 A.2d 177, 191 (Md. 2007)).

court must weigh the termination of parental rights ("TPR") factors listed in D.C. Code § 16-2353(b). *In re Ta.L.*, 149 A.3d at 1072.

"After careful consideration of these factors," Magistrate Judge Staples found clear and convincing evidence that appellant was "withholding [his] consent[] to the proposed adoption contrary to the best interests" of K.J.[8] Appellant had neither met K.J. nor "played any role in her life" and did "not want to care for [her] at this time." Conversely, the J.s provided the "only real stability" K.J. had ever known and removing K.J. from their home would "cause [her] severe emotional trauma." Moreover, K.J. did not desire to meet appellant and wanted to be adopted by the J.s. Judge Pasichow also noted on review that, "while the termination of [L.M.J.'s] parental rights [was] a drastic remedy, the 'wait and see' alternative—indefinitely deferring adoption of K.J. while she cycles through the foster care system—[was] not a viable one as it is contrary to [K.J.'s] best interests." *See, e.g., In re J.L.*, 884 A.2d 1072, 1078 (D.C. 2005); *In re L.L.*, 653 A.2d 873, 887-88 (D.C. 1995).

---

[8] "Where a biological parent declines to consent to a proposed adoption, the prospective adoptive parent must ordinarily show by clear and convincing evidence that consent is being withheld contrary to the child's best interest." *In re C.L.O.*, 41 A.3d at 511 (citing *In re J.G.*, 831 A.2d 992, 999 (D.C. 2003)).

A court may enter a final decree of adoption when it is satisfied that the factors set out in D.C. Code § 16-309(b) (2012 Repl. & 2020 Supp.) are met. Judge Staples found that the J.s were "fit and proper people to adopt" K.J. and that K.J. was "suitable for adoption by" the J.s. The J.s "have remained a constant part of [K.J.'s life] for more than 5 years" and have "provided the only real stability for [her] in a life otherwise marked with indifferent and inconsistent care." Judge Staples also analyzed the TPR factors and determined that adoption by the J.s was in the best interests of K.J.

The J.s are "fierce advocates" for K.J.'s well-being and love her "immensely." They also work with K.J.'s "medical and mental health providers to provide consistent and appropriate services" for her special needs. The trial court found that K.J. had "significant emotional needs" and that the J.s had the "ability to meet those needs" and were "physically and emotionally healthy and able" to care for K.J. K.J. is "fully integrated into the home of Mr. and Mrs. J." and considers their "biological children to be [her] brothers and the J.'s parents to be [her] grandparents." On this record we readily conclude that the Superior Court did not abuse its discretion by terminating appellant's parental rights and granting the J.s' adoption petition.

## V. Conclusion

Appellant was not entitled to the presumption in favor of a fit parent or to the finding of unfitness ordinarily required to rebut that presumption. There is clear and convincing evidence that the waiver of appellant's consent and adoption by the J.s were in the best interests of K.J. Therefore, the judgment of the Superior Court is hereby.

*Affirmed.*

BECKWITH, *Associate Judge*, dissenting: The trial court in this case terminated L.M.J.'s parental rights with respect to his biological daughter, K.J., based solely on the statutory best-interest factors—that is, on the ground that L.M.J. was withholding his consent to the foster parents' adoption of K.J. contrary to K.J.'s best interest.[1] It reached this conclusion without making the fitness finding to which a biological parent facing termination of rights is constitutionally

---

[1] D.C. Code § 16-2353(b) (2012 Repl.).

entitled, absent exceptional circumstances.[2] The majority, while acknowledging the trial court's failure to evaluate and rule on L.M.J.'s fitness, nonetheless affirms the termination of L.M.J.'s parental rights because, in my colleagues' view, fit or not, L.M.J. failed to grasp the "opportunity that no other male possesses to develop a relationship with his offspring" and therefore had no such constitutionally protected interest in the first place. *Ante* at 10 & n.3 (quoting *Lehr v. Robertson*, 463 U.S. 248, 262 (1983)). The majority reaches this conclusion even though, as with fitness, the trial court did not rule on the opportunity-interest issue either and did not question that L.M.J. was fit to parent K.J. or that he *had* grasped that interest. Because the majority sidesteps the constitutional protection for fit parents by imposing a stringent opportunity-interest condition that was not the basis of the trial court's ruling and that is a mismatch for the circumstances of this case, I respectfully dissent from the majority's decision to affirm the termination of L.M.J.'s parental rights.

This case raises questions about the consistent application of our doctrines that allow a court to grant an adoption over a biological parent's objection, without

---

[2] *In re Ta.L.*, 149 A.3d 1060, 1081–83 (D.C. 2016) (en banc); *see also In re J.B.S.*, 237 A.3d 131, 143 (D.C. 2020) (en banc) (stating that "parental 'fitness,'" though not statutorily defined, "refers to the parent's intention and ability over time to provide for a child's wellbeing and meet the child's needs") (quoting *In re S.L.G.*, 110 A.3d 1275, 1286–87 (D.C. 2015)).

a finding that the parent was unfit, after determining as a threshold matter that the parent had surrendered whatever liberty interest he had in raising his child. The well-known "Baby Richard" and "Baby Jessica" cases exemplify the sort of traumatic result that can occur when a presumptively fit and largely blameless biological parent who has never met his child appears late in the game seeking to scuttle or even delay an adoption, and when a court honors that parent's right to withhold consent to that adoption.[3] The circumstances here—particularly the signs in the record that L.M.J. and the foster parents would likely allow each other to maintain or develop a relationship with K.J. regardless of the result at trial—make this case less potentially dramatic than the Baby Richard and Baby Jessica cases. But like those cases, this case underscores the tension between the imperative of

---

[3] In these two cases, courts ultimately removed children from the adoptive parents' care—despite persuasive arguments that adoption was in each child's best interest—and placed them with their fit biological fathers who had previously been out of the picture. *In the Interest of B.G.C.*, 496 N.W.2d 239, 241, 245 (Iowa 1992) (ordering a transfer of custody to the newly discovered biological father, even though the adoptive couple had custody "virtually from the time of [the child's] birth" and had "provided exemplary care for the child"); *In re Petition of Doe*, 638 N.E.2d 181, 182 (Ill. 1994) (concluding that where the father had not learned of his newborn child's existence until after adoption proceedings began, "the father had no opportunity to discharge any familial duty" and his "preemptive rights to [his] own children" could not yet be terminated on best-interest-of-the-child grounds); *id.* at 185 (McMorrow J., concurring) (quoting *In re Petition of Doe*, 627 N.E.2d 648, 653 (Ill. App. Ct. 1993)) ("[T]he only parents that [the child] has ever known are John and Jane Doe. . . . [H]e is totally unaware of the existence of his biological parents.") (cleaned up).

finality for children who may have spent years in the foster-care system[4] and a biological parent's fundamental constitutional right to have his parental rights terminated only upon a finding that he is unfit to parent his child. *In re Ta.L.*, 149 A.3d at 1081–83; *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Stanley v. Illinois*, 405 U.S. 645, 651–52 (1972).

Although adoption challenges by a fit parent who has never met his child are not common, their potential for harsh-seeming consequences has nonetheless prompted a number of proposals that seek to mitigate such outcomes while still respecting biological parents' constitutional rights to develop and maintain relationships with their children. Some states have created putative father registries by which a father's legal rights—such as the right to notice of an impending adoption of his biological child—are conditioned on his filing a claim of possible paternity with the state's registry. *See, e.g.*, *Lehr*, 463 U.S. 248. One scholar has proposed a type of adoption that is accomplished without terminating the rights of biological parents in certain limited circumstances. *See* David D. Meyer, *Family Ties: Solving the Constitutional Dilemma of the Faultless Father*,

---

[4] *See In re M.N.M*, 605 A.2d 921, 925 (D.C. 1992) ("This case presents a conflict between the powerful demand for finality in adoption proceedings reflected in D.C. Code § 16-310 and a serious apparent defect in the adoption order, namely, the failure to give notice of the pendency of the adoption proceedings to the putative natural father.").

41 Ariz. L. Rev. 753, 813–22 (1999).[5]  And a New York Court of Appeals judge articulated a judicious balancing approach in a case in which a blameless biological father sought to unravel a 10-month-old adoption.  In an oft-cited concurrence in *Robert O. v. Russell K.*, 604 N.E.2d 99 (N.Y. 1992), Judge Vito Titone determined that although the late-arriving biological father "had no realistic opportunity to manifest his parental commitment and, accordingly, cannot be treated as though he knowingly relinquished that opportunity," that interest "simply cannot be accommodated without sacrificing the paramount State interest in finality."  *Id.* at 106–07 (Titone, J., concurring).[6]

In the absence of such legislative initiatives or pointed case law, we are left to apply our law as it exists.  That normally means that unless L.M.J. was found to

---

[5]  In this alternative model of adoption, "the adoptive parents would gain custody, full decision-making authority over the child, and full status as parents while the biological parent would retain a right to visit and communicate with the child but not to seek custody except under exceptional circumstances." *Id.* at 822.

[6]  Judge Titone proposed in his concurrence that the court should have recognized that the father had a "constitutionally *cognizable* interest in a parental relationship with his biological child," but weighed that interest against the state's countervailing interest in ensuring the finality of adoptions.  *Id.* As one scholar pointed out, "both Justice Titone and Justice Stevens [in his dissent in *Caban v. Mohammed*, 441 U.S. 380 (1979)] seem to suggest that the better view in some of these cases is that the rights of the biological father can be overridden, not that the biological father simply does not have protected rights."  Mark Strasser, *The Often Illusory Protections of "Biology Plus:" on the Supreme Court's Parental Rights Jurisprudence*, 13 Tex. J. on C.L. & C.R. 31, 63 (2007).

be unfit, he had a "constitutionally cognizable interest"[7] in his relationship with K.J., and that "parent and child relationship" should not have been "completely sever[ed] and extinguishe[d]" through the termination of his parental rights. *See* D.C. Code § 16-2352. If there is a question as to his fitness, or if, as here, the trial court granted an adoption and terminated parental rights without first determining that the biological parent was unfit, this court should remand to allow the trial court to hold a fitness hearing. *See, e.g.*, *In re S.L.G.*, 110 A.3d at 1290–91. While this court has allowed for the possibility of "truly exceptional circumstances" in which a parent's rights might be terminated without a fitness determination, *see In re Ta.L.*, 149 A.3d at 1088, no one is suggesting this case rises to whatever level that may be, *see In re S.L.G.*, 110 A.3d at 1291 (Newman, J., concurring) (stating that his "fertile imagination" was "not able to postulate a realistic factual situation where a 'fit' parent can be properly deprived of parental rights based on 'the best interest of the child'"); *see also In re J.B.S.*, 237 A.3d 131, 143 (D.C. 2020) (en banc).

The majority here avoids giving effect to a biological parent's right to a fitness finding by deciding that L.M.J. had no liberty interest in developing a relationship with his child to begin with. Even setting aside the fact that the trial

---

[7] *See Robert O.*, 604 N.E.2d at 106 (Titone, J., concurring).

court did not rule on opportunity-interest grounds, the doctrine has no coherent application in the circumstances of this case and amounts to an end run around the presumption in favor of a fit biological parent.[8]

There is a good reason—in fact many good reasons—the trial court in this case appeared to assume that L.M.J.'s opportunity interest remained intact.[9] For four years, from the beginning of the neglect case in 2009 until after the adoption proceedings commenced in 2013, K.J.'s biological mother, C.J., had maintained

---

[8] Professor Meyer observed that although many states have sought to facilitate adoptions by expanding concepts like abandonment and "step[ping] up their demand on unwed fathers who wish to assert parental rights," he doubted that courts would "permit this strategy to effect an end-run around the constitutional 'unfitness' requirement." Meyer, *supra*, at 788 (discussing those courts that "have held that the Constitution will not permit states to construct statutory schemes that effectively railroad blameless fathers out of their children's lives").

[9] The magistrate judge, for example, contrasted L.M.J.'s situation with that of K.J.'s brother's biological father, whose consent was not required because he had abandoned K.J.'s brother. In determining that L.M.J. and K.J.'s biological mother, C.J., had waived their consent, the court implicitly rejected any claim that L.M.J. had not grasped his opportunity interest. Put differently, the magistrate judge need not have reached the consent-waiver issue if it had concluded that L.M.J. had not grasped his opportunity interest as the majority today suggests. And on appeal from that order, the associate judge recognized the preference for "a fit unwed father who has grasped his constitutionally protected opportunity interest," *In re Baby Boy C.*, 630 A.2d 670, 682 (D.C. 1993), and went on to find that preference rebutted with a showing by clear and convincing evidence that the adoption was in the child's best interest. The associate judge thus concluded— contrary to our case law—that as long as the best interest factors favored adoption, L.M.J.'s rights could properly be terminated regardless of his fitness and "regardless of any attempts he has made to 'grasp' his opportunity interest."

through sworn affidavits and various court filings that a different man, A.P., was the girl's biological father. Once DNA tests precluded A.P.'s paternity and confirmed that L.M.J. was K.J.'s father, L.M.J. promptly sought to be in K.J.'s life, taking every step he could to form a relationship with his daughter. He contacted the Department of Child and Family Services, requested visits with K.J., met with her social worker and therapist, wrote her letters, brought his mother and sister to team meetings with the other participants in K.J.'s case, and came forward to contest the adoption that would sever the father-daughter relationship before it ever began. He also met with Mrs. J., K.J.'s foster mother (and now adoptive mother), who compared L.M.J. favorably to K.J.'s brother's essentially uninvolved father. In that regard, Mrs. J. testified that she made a point of talking to K.J. about her biological father because L.M.J. was "active" and Mrs. J. knew "he want[ed] to see her": "That's the reason I told her," and "she wouldn't know either" if L.M.J. "wasn't that active or trying to see her." Mrs. J. had also met L.M.J.'s mother and sister and approved of K.J.'s visiting with them as well as with L.M.J., stating that she was "not trying to keep [K.J.] away from her father . . . or her grandparents."

The majority nonetheless concludes that L.M.J. relinquished his parental rights by not stepping forward sooner, in 2010 or 2011—before DNA testing established his paternity—when he had a chance meeting with K.J.'s mother, C.J.,

in which C.J. gave him a photograph of K.J.[10] *Ante* at 16–17. C.J.'s statement to L.M.J. that the girl in the photo might be his daughter was starkly contradicted by C.J.'s multiple sworn affidavits declaring that A.P. was the father and that no one else could be the father.[11] That declaration was still in force after the adoption petition was filed in April 2013, and C.J. testified at trial that at the time she signed the sworn affidavit, she "did believe that" A.P. was the father. In addition, this court has recognized "the limitations state action can impose on a noncustodial father once the child is placed with another family," *Appeal of H.R.*, 581 A.2d 1141, 1162 (D.C. 1990), and by the time L.M.J. and C.J. had run into each other, K.J. had already been in the custody of the Child and Family Services Agency (CFSA) for at least a year and was living with another foster parent.

All the other participants in the previous neglect case and initial adoption

---

[10] It is undisputed that C.J. did not inform L.M.J. prior to this point that she had given birth in 2006, and the majority notes that it does "not fault" L.M.J. "for failing to act as soon as K.J. was born." *Ante* at 15.

[11] The affidavit read: "My initials on the preceding line indicate I believe no one else could be the child's father other than the person whose name appears immediately below and that I am unable to identify anyone else who could be the child's father." C.J.'s initials appeared on the line preceding the statement and A.P.'s name appeared on the line below the statement. In the next section, which instructed: "Complete if the biological mother is unsure about the identity of the biological father," C.J. filled out nothing.

proceedings were working under the assumption that A.P. was K.J.'s father,[12] and it is reasonable to expect that any overtures on L.M.J.'s part would have encountered the same hurdles L.M.J. encountered after C.J. named him as the father but before his paternity was confirmed by DNA testing.[13] Concerns over K.J.'s own well-being also counseled against acting on speculative information that conflicted with sworn affidavits identifying someone else as her father. As K.J.'s foster mother testified, the uncertainty about K.J.'s father's identity "was confusing to her," and K.J.'s therapist testified that "this was a surprise to her" and "a change in . . . what she had known." In these circumstances, the publicly controverted statement C.J. made to L.M.J. in 2010 or 2011 cannot meaningfully detract from L.M.J.'s ardent effort to maintain his parental rights once he learned C.J. formally named *him* as the father.

---

[12] As the foster mother described the situation after A.P. was precluded as the father and L.M.J.'s paternity was confirmed, "dad just came in the picture" and "didn't know he had a child." The social worker, Rochelle White, mentioned in her testimony that she and others assumed someone else was K.J.'s father and that she did not know L.M.J. was her father until July of 2014.

[13] Before his paternity was established, L.M.J. was not permitted to visit his daughter. Rochelle White, the social worker, testified that once DNA testing had confirmed the relationship, the "team" would not grant L.M.J.'s requests to visit K.J. until they received input from Ms. Dodge, the therapist. After L.M.J. met with Ms. Dodge, she approved visitation, but K.J.'s refusal to meet him led to a letter-writing plan to allow K.J. to get to know L.M.J.

With respect to the majority's alternative contention that L.M.J. was disqualified from preserving his parental rights because he did not seek custody of K.J., *see ante* at 10–13, it is unclear, as an initial matter, whether this purported failing is a subset of the opportunity-interest doctrine or a distinct requirement. In any event, this argument rests on a mistaken factual premise and also has no legal footing, at least as the majority envisions its application to this case.

As a factual matter, Rochelle White, the social worker assigned to the case, testified that L.M.J. was, in fact, "interested in having K.J. in his home or in his care" when she was asked whether he "ever express[ed] an intention of obtaining custody of his daughter." L.M.J.'s acknowledgement that immediate removal of his daughter from her foster home would be ill-advised did not demonstrate a lack of interest in taking "some measure of responsibility for the child's future." *Lehr*, 463 U.S. at 262. It reveals instead that L.M.J. contemplated caring for K.J. and that he was realistic about the need to proceed gradually—a responsible approach given that he and K.J. did not know each other and that for the past several years her mother had formally named another man as her father. As counsel stated in closing arguments, L.M.J. had "every right to have [K.J.] placed with him," but if the adoption were not granted her "placement [was] not going to immediately change." In every respect, L.M.J. was acting in K.J.'s best interest.

As a legal matter, my colleagues' view that L.M.J. was not entitled to the presumption favoring a biological parent because he did not seek "an actual relationship of parental responsibility" belies this court's and the Supreme Court's decisions, even if its factual premise were correct, which it is not. Parents who lose custody of their children as a result of neglect or abuse still retain a "fundamental liberty interest" in the care of those children. *Santosky*, 455 U.S. at 753. And many people enjoy parental rights, and are good parents, despite not having custody of or living with their children.[14] The phrases the majority extracts from the cases about a father's "right to custody" and his right to "raise" or to "parent" his child do not amount to a requirement that an unwed father unequivocally request custody or involuntarily relinquish his rights as a biological parent. *See Ante* at 10–13. In circumstances in which the unwed father's "opportunity . . . to shoulder the responsibility of parenthood may disappear before he has a chance to grasp it, no matter how willing he is to do so," the better approach is to "acknowledge[] that in some instances the Constitution protects an

---

[14] Cohabitation is of course not the only way to "raise" or "parent" a child, and the majority's reliance upon cohabitation as a significant measure of "parental responsibility" casts into doubt the rights of unwed fathers in a range of common family arrangements—a military parent stationed abroad, a parent whose profession requires near-constant travel, separated biological parents living in different states, and so on.

unwed father's *opportunity* to develop a relationship" with his child, whether or not that opportunity will lead to a custodial arrangement. *See Robert O.*, 604 N.E.2d at 102.

And finally, as to *Quilloin v. Walcott*, 434 U.S. 246 (1978), the case the majority most relies on in this regard, the Supreme Court held that due process was not implicated where the father had had eleven years to demonstrate his commitment to "significant responsibility with respect to the daily supervision, education, protection, or care of the child," *id.* at 249, 256, and where he was challenging the child's adoption into "a family unit already in existence" that included the child's biological mother, *id.* at 255. Here, the people who sought to adopt K.J. were unrelated by birth and had been K.J.'s foster parents for just three months when they filed the adoption petition. L.M.J.'s paternity was confirmed after that petition was filed, and this presumptively fit biological father did everything he could reasonably do to protect his parental rights, including presenting a timely challenge to the J.s' adoption of his daughter. *Quilloin* is in a wholly different category of cases and does not authorize the court's termination of L.M.J.'s parental rights.

As Judge Titone proposed in *Robert O.*, we should decline to decide this

appeal based upon an exaggerated and unfair portrayal of L.M.J.'s purported failings as a father. We should not demonize someone who so plainly had a genuine interest in knowing his daughter and preserving their relationship. And while there might be cases, like *Robert O.* itself, where the challenge to the adoption comes so late that the rights of a blameless father must yield to the interest in finality, this is not such a case. Unlike in *Robert O.*, where the biological father was challenging an adoption that had been final for almost a year, here the finality calculus favors L.M.J. He responded promptly to the notice of the adoption proceedings, which he received after a DNA test showed that A.P. was not K.J.'s father. That order indicated that he had "the right to seek custody of the child or to challenge the adoption," and he accordingly took steps to oppose the adoption. Further, though K.J. had known her foster parents for years, she had lived with them for only a short time when they petitioned for adoption. That Mrs. J., K.J.'s foster mother, told K.J. that her father wanted to be in her life and encouraged K.J. to get to know him tends to support L.M.J.'s contention that it was not too late for him to become a parent to K.J. Because this is not a case where the urgency to finalize the adoption justifies terminating L.M.J.'s rights without determining that he was unfit and without giving him time to develop a relationship with his daughter, I would reverse the trial court's order.